IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHRISTY BRANNING for H.T.B,      )
                                 )
            Plaintiff,            )
                                 )
      v.                         )      CIVIL ACTION NO. 1:09CV122-SRW
                                 )               (WO)
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,              )
                                 )
            Defendant.           )

## MEMORANDUM OF OPINION

Christy Branning for H.T.B.[1] brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security

("Commissioner") denying her daughter's second application for Supplemental Security

Income under the Social Security Act.  The parties have consented to entry of final judgment

by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and

briefs submitted by the parties, the court concludes that the decision of the Commissioner is

due to be affirmed.

## BACKGROUND

Plaintiff was born on August 11, 2000. On July 6, 2004 (protective filing date),

plaintiff's mother filed the present application for Supplemental Security Income (SSI) on

plaintiff's behalf, alleging that plaintiff has been disabled since January 9, 2002 (when she

---

[1]  The court refers to H.T.B. as the "plaintiff" in this memorandum of opinion.

was seventeen months old) due to ADHD and compulsive behavior  (See Exhibits 2D, 3D,

10E).[2]   The claim was denied initially on August 23, 2004.  (Exhibit 2D). On January 11,

2006, an ALJ conducted an administrative hearing. (R. 619-33). The ALJ rendered a decision

on August 24, 2006, in which he found that plaintiff has not been disabled, as defined in the

Social Security Act, since July 6, 2004, the date the present SSI application was filed.  (R.

18-31).  On December 23, 2008, the Appeals Council denied plaintiff's request for review

(R. 7-10) and, on February 18, 2009, plaintiff filed the present appeal.[3]

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v.

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

---

[2]  Plaintiff's previous application for supplemental security income was filed on January 10, 2002, the day after the alleged onset date in the present application. In the previous application, however, plaintiff's mother alleged that plaintiff was disabled on the basis of asthma and allergies. The claim was denied on February 28, 2002.  (See Exhibits 1A, 1D, 2E-8E).

[3]  On December 23, 2008, the Appeals Council entered an order identifying the additional evidence it had received in this case, and making that evidence part of the record.  The Appeals Council order lists two exhibits: (1) AC-1, "Medical records from Wiregrass Medical Center and Children's Hospital" and (2) "Attorney brief." (R. 10).  In the transcript filed with the court, Exhibit AC-1 includes four pages.  (R. 6, 611-14).  All four pages are records from Children's Hospital; Exhibit AC-1 includes no medical records from Wiregrass Medical Center.  Accordingly, the court directed plaintiff's counsel to file the Wiregrass Medical Center records he submitted to the Appeals Council with his May 31, 2007 brief, along with confirmation of the facsimile transmission to the Appeals Council.  He has done so (see Doc. # 21, 22), and the court has considered those records in resolving the present appeal.

(11th Cir. 1991). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Factual findings that are supported by substantial evidence must be upheld by the court. See Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990)("Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence."). The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Analysis of Childhood Disability Claims

"Federal regulations set forth the process by which the SSA determines if a child is disabled and thereby eligible for disability benefits." Shinn ex rel. Shinn v. Commissioner of Social Sec., 391 F.3d 1276, 1278 (11th Cir. 2004) (citing 42 U.S.C. § 1382c(a)(3)(C)(I) and 20 C.F.R. § 416.906). "The process begins with the ALJ determining whether the child is 'doing substantial gainful activity,' in which case she is considered 'not disabled' and is ineligible for benefits." Id. (citing 20 C.F.R. §§ 416.924(a), (b)). "The next step is for the

ALJ to consider the child's 'physical or mental impairment(s)' to determine if she has 'an impairment or combination of impairments that is severe.'" Id. (citing 42 U.S.C. §§ 416.924(a), (c)). "For an applicant with a severe impairment, the ALJ next assesses whether the impairment 'causes marked and severe functional limitations' for the child." Shinn, 391 F.3d at 1278  (citing 20 C.F.R. §§ 416.911(b), 416.924(d).)  This determination is made according to objective criteria set forth in the Code of Federal Regulations (C.F.R.). As the Eleventh Circuit has explained,

> [t]he C.F.R. contains a Listing of Impairments ["the Listings", found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories. See id. § 416.925(a). For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered "marked and severe." Id. ("The Listing of Impairments describes ... impairments for a child that cause[ ] marked and severe functional limitations.").
>
> A child's impairment is recognized as causing "marked and severe functional limitations" if those limitations "meet[ ], medically equal[ ], or functionally equal[ ] the [L]istings." Id. § 416.911(b)(1); see also §§ 416.902, 416.924(a). A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment. A child's limitations "medically equal" the limitations in the Listings if the child's limitations "are at least of equal medical significance to those of a listed impairment." Id. § 416.926(a)(2).

Id. at 1278-79. "Finally, even if the limitations resulting from a child's particular impairment are not comparable to those specified in the Listings, the ALJ can still conclude that those limitations are 'functionally equivalent' to those in the Listings.   In making this determination, the ALJ assesses the degree to which the child's limitations interfere with the child's normal life activities. The C.F.R. specifies six major domains of life:

(i) Acquiring and using information;

(ii) Attending and completing tasks;

(iii) Interacting and relating with others;

(iv) Moving about and manipulating objects;

 (v) Caring for [one]self; and

(vi) Health and physical well-being."

Shinn, 391 F.3d at 1279 (citing 20 C.F.R. § 416.926a(b)(1)). "The C.F.R. contains various 'benchmarks' that children should have achieved by certain ages in each of these life domains." Id. (citing 20 C.F.R. §§ 416.926a(g)-(l)). "A child's impairment is 'of listing-level severity,' and so 'functionally equals the listings,' if as a result of the limitations stemming from that impairment the child has 'marked' limitations in two of the domains [above], or an 'extreme' limitation in one domain."   Id. (citing 20 C.F.R. § 416.926a(d) and § 416.925(a)).[4]

Additionally, a child is not disabled within the meaning of the Social Security Act unless the impairment or combination of impairments which meets, medically equals or functionally equals the listings either has lasted or can be expected to last for a continuous

---

    [4] " A 'marked' limitation is defined as a limitation that 'interferes seriously with [the] ability to independently initiate, sustain, or complete activities,' and is 'more than moderate.'" Henry v. Barnhart, 156 Fed. Appx. 171, 174 (11th Cir. 2005)(unpublished opinion)(citing 20 C.F.R § 416.926a(e)(2)(I)). "An 'extreme' limitation is reserved for the 'worst limitations' and is defined as a limitation that 'interferes very seriously with [the] ability to independently initiate, sustain, or complete activities,' but 'does not necessarily mean a total lack or loss of ability to function.'" Id. (citing 20 C.F.R. § 416.926a(e)(3)(I)).

5

period of twelve months or to result in death. 42 U.S.C.A. § 1382c(a)(3)(C)(i)("An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."); 20 C.F.R. § 416.924 ("If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings.  If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled."); Cf. Barnhart v. Walton, 535 U.S. 212 (2002)(upholding, in the adult disability context, the Commissioner's regulatory interpretation that it is the inability to engage in substantial gainful activity, rather than the impairment(s), which must meet the 12 month duration requirement).

## Plaintiff's Contentions

The ALJ found that plaintiff suffers from severe impairments of attention deficit hyperactivity disorder, mood disorder, and oppositional defiant disorder.  He concluded that she does not have an impairment or combination of impairments that meets or equals any listed impairment and, further, that she does not have an impairment or combination of impairments that functionally equals the listings.  In his decision, the ALJ indicated that he specifically considered Listings 112.02 (organic mental disorder), 112.04 (mood disorder),

112.08 (personality disorder), and 112.11 (attention deficit hyperactivity disorder). Plaintiff does not argue that she meets or medically equals one or more of the Listings identified by the ALJ, nor does she identify specifically any other listing which she contends is applicable. Rather, she asserts that the Commissioner's decision should be reversed because: (1) the ALJ erred by rejecting the medical opinion of Dr. Srilata Anne, plaintiff's treating psychiatrist; and (2) the ALJ failed to state with particularity the weight he gave the medical opinion expressed by Dr. Simpson, the reviewing state agency psychologist.

On December 21, 2005, Dr. Anne signed a mental RFC form indicating that plaintiff is mildly impaired in her ability to acquire and use information, moderately impaired in her ability to attend and complete tasks and her ability to move about and manipulate objects, and markedly impaired in three domains: (1) the ability to interact and relate with others; (2) the ability to care for herself; and (3) health and physical well-being. (Exhibit 17F). On August 20, 2004, the non-examining state agency psychologist Dr. Simpson concluded, based on his review of the then-available medical records, that plaintiff had no limitation in the domains of acquiring and using information, moving about and manipulating objects, caring for herself, and health and physical well-being; a less than marked limitation in the domain of interacting and relating with others; and a marked limitation in the domain of attending and completing tasks. (Exhibit 11F). The ALJ found plaintiff to have no limitation in the domains of acquiring and using information, moving about and manipulating objects, and health and physical well-being. He found that she has less than marked limitations in the remaining

three domains of attending and completing tasks, interacting and relating with others, and caring for herself.  Thus, while the ALJ found that plaintiff does suffer limitations as a result of her impairments, he did not find those limitations to be disabling.  (R. 24-31).

Plaintiff's mother first complained of plaintiff's behavior problems to a nurse practitioner at plaintiff's two-year "well baby" exam on August 12, 2002.[5]  She reported that the "police came to the house to pick [plaintiff] up and take her to her father's" and that, after plaintiff had returned home from spending a month with her father, she was "extremely whiny and throwing frequent temper tantrums."  She stated that plaintiff had not responded well to time-outs or to being told not to hit or throw tantrums. The nurse referred plaintiff to Dr. Jordan, a psychologist, for further evaluation and treatment. (R. 482-83).

There are no medical treatment notes evidencing further complaints of mental health symptoms until January 2004, when plaintiff's mother sought treatment from plaintiff's pediatrician for plaintiff's cold symptoms.  She reported that plaintiff had not slept well and had started, the previous day, taking Adderall XR prescribed by Dr. Tessama.  Dr. Brown advised plaintiff's mother to resume giving her Tenex (which had been prescribed for her in December 2003) and to follow up with Dr. Tessama soon.  (R. 461, 464).[6]  The records from

---

[5]  Plaintiff's pediatric medical record demonstrates that she has been treated for a variety of physical illnesses and conditions.  The court has considered the entire record but here discusses only the evidence relating to plaintiff's mental impairments.

[6]  In the disability report she filed in support of the application, plaintiff's mother did not include Dr. Tessema or Dr. Jordan in her list of medical providers.  (R. 113-14). She listed SpectraCare as a service provider, but the record does not indicate whether either Dr. Tessema or Dr. Jordan is associated with SpectraCare and, when the claims examiner sought records from

plaintiff's pediatrician reflect that plaintiff remained on Tenex for the next couple of months and that, during this period, she was evaluated by psychologist Melanie Cotter Ph.D. (R. 453-62; Exhibit 8F).  Dr. Cotter, on referral from plaintiff's pediatrician, evaluated plaintiff in three sessions over a one-month period; she diagnosed anxiety disorder NOS (with a "strong obsessive-compulsive flavor"); oppositional defiant disorder; parent-child relational problem (with "questionable support and engagement"); relational problem NOS (with "social withdrawal and avoidance") and "monitor emerging mood pattern." She recommended close monitoring of plaintiff's medication, with possible changes to address the mood pattern; she further recommended that plaintiff's mother "follow-up with interventions that have been previously addressed by Dr. Jordan" and to attend parenting classes or receive counseling on parenting skills. When Dr. Cotter discussed her recommendations with plaintiff's mother, plaintiff's mother "acknowledge[d] child does not take her seriously."   (Exhibit 8F).

　　　On March 26, 2004, plaintiff was started on Paxil; Dr. Benak advised plaintiff's

---

SpectraCare, he received a response stating that SpectraCare had no records as of July 20, 2004 pertaining to the plaintiff. (Exhibit 10F).  A few of Dr. Jordan's treatment notes are included within the medical records from plaintiff's pediatric clinic for visits in early 2005 (R. 405, 407, 410), but there are no earlier records from Dr. Jordan and no records at all from Dr. Tessema.  There is also an indication in plaintiff's pediatric clinic treatment notes in August 2004 – two and a half months after she filed the present application – that she is "followed by Dr. Lopez" for behavioral problems (R. 440); in a disability appeal report that she completed on August 25, 2004, plaintiff's mother indicated that plaintiff had started seeing Dr. Lopez and Gwen Downing, a therapist, at SpectraCare in July 2004 (R. 133-38).  However,  plaintiff – who has been represented by counsel since October 2004 (R. 59) – submitted no treatment records from Dr. Lopez or Ms. Downing.  See Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003)(ALJ is not required to develop the record for the period after the claimant applies for benefits).

mother to discontinue the Paxil four days later, after plaintiff's mother reported that plaintiff was exhibiting violent behavior.  In the early morning hours of March 31, 2004, plaintiff was treated at the Wiregrass Medical Center for extreme hyperactivity soon after she had stopped the Paxil.  She was treated by the ER staff with Ativan, and required a second dose by mouth when the first dose, administered by shot in her left thigh thirty minutes earlier, did not calm the plaintiff.  Plaintiff was sent home with her mother, with instructions to follow up with her doctor.  That morning, plaintiff's mother took her to the pediatrician's office, reporting that plaintiff had begun to hallucinate.  Plaintiff was observed for approximately five hours at the pediatrician's office; she slept during that entire time. She awoke at 3:00 p.m., "appropriate to exam and verbal stimuli." The pediatrician, Dr. Barron, believed that plaintiff had experienced a reaction to the Ativan.  (R. 453-455; Doc. # 22, pp. 32-35).

On April 14, 2004, plaintiff's mother took plaintiff to Dr. Srilata Anne of the Behavioral Health Department of Children's Hospital in Birmingham for evaluation.  She told Dr. Anne that plaintiff had been on Tenex with minimal improvement, on Adderall and Paxil which were discontinued because of side effects, and that she had also taken Strattera. Dr. Anne noted that plaintiff was "very hyperactive" in the office; she was running and throwing things; she ran into the corridor and her mother had to chase her; she was hitting her mother and tried to poke her mother's eyes with a pencil; and she was crying and screaming toward the end of the session because she "couldn't get her way."  Dr. Anne recommended that plaintiff be admitted to the hospital for evaluation and medication

10

management.  (R. 580-83).

Plaintiff was admitted to Children's Hospital on March 16, 2004 and remained there for four days. She was started on Tenex with "positive results" and no side effects. Plaintiff's diagnosis, upon discharge on March 20th, was disruptive behavior disorder; she was to be followed after discharge by Dr. Anne for medication management, Steve Bell for individual therapy and social worker Carolina Endert for case management.  (Exhibit 9F). Nine days after her discharge, plaintiff's mother took her back to Dr. Anne.  The doctor reported that plaintiff was doing better after her discharge initially but that, over the past few days, she was "back to normal" with regard to her hyperactivity.  During the appointment with Dr. Anne, plaintiff was touching things and constantly moving, and she again tried to run out into the corridor.  Dr. Anne first recommended trying low dosages of stimulant medications Ritalin or Dexedrine; citing plaintiff's previous problems with medications, plaintiff's mother refused to consent to trying any stimulant medication on an outpatient basis. She stated that she wanted plaintiff to be admitted again before trying the medication, explaining that she was reluctant to try Ritalin because of the "bad things" she had heard about it and because her family did not want plaintiff to be on Ritalin.  Dr. Anne discussed the possibility of increasing the dosage of Tenex instead; plaintiff's mother "was not keen on it" and "wanted [plaintiff] to be admitted before any medication changes can be made." Dr. Anne then had nurse Hinton join the meeting, and Hinton explained the medications Ritalin and Dexedrine, and their possible side effects, to plaintiff's mother.  Plaintiff's

mother stated that she wanted to try the medication, but "only on an inpatient unit [and] not as [outpatient]. Dr. Anne stated, "Since [plaintiff's mother] is reluctant to try any medications [as outpatient] and insisted on in[patient] treatment, [patient] was put on waiting list," as there were no beds then available.  (R. 578-79).  Plaintiff was readmitted to the hospital on May 7, 2004. (R. 347).

On May 12, 2004, while she was working to set up post-discharge in-home services "to assist with parenting issues," social worker Carolina Endert consulted with Dr. Maxwell, who told her that he understood that plaintiff had been "kicked out of the Head Start Program." Endert contacted the Special Education Coordinator, Steve Swann; Swann contacted the Head Start Coordinator, Monette Barr, who told him that plaintiff had been "withdrawn from Head Start[.]" Barr "indicated that [plaintiff's] behaviors were not of concern t[o] them, and her behaviors were not greater th[a]n those of other children.  The school teachers have no difficulty managing her. [Plaintiff's] progress is at an age-appropriate level[.]" (R. 577).

At plaintiff's follow-up visit with Dr. Anne on June 10, 2004, Endert was present. Plaintiff's mother reported that plaintiff had initially done well after discharge from the second hospitalization but that she had been difficult to manage for the "past 10 days."  She stated that plaintiff had been angry and "went back to her bad ways."  She said that, with the medications, plaintiff was not able to focus. Dr. Anne noted "[Discussed with mother] about the report Ms[.] Carolina had from the Head Start – Rep[o]rt fr[o]m Head Start stated that

they had no problems [with plaintiff] and that [plaintiff's behavior] was same as any child of her age."[7]  Dr. Anne observed, in her mental status evaluation, that plaintiff was cooperative, was playing with the doll house, was calm, and was not hyperactive, and that she listened when her mother told her to do something and said "I love you" to her mother. Endert informed plaintiff's mother about parenting classes and in-home services.  Dr. Anne noted that "[plaintiff] has been more calm + less hyperactive in this session compared to the previous sessions."  (R. 575-76).  Eight days later, on June 18, 2004, plaintiff was readmitted to the hospital after her mother reported that the medications were "not controlling child's behavior." (R. 347).[8]

On July 8, 2004, a week after plaintiff's third discharge from the hospital, Dr. Anne and Endert met with plaintiff and her mother.  Plaintiff's mother reported that plaintiff was "doing real good," and that she was going to day care from 8 a.m. to 5 p.m., Monday through Friday. She said that plaintiff was less impulsive, less "hyper," and that she could "'understand' better."  Dr. Anne indicated that plaintiff was compliant with her medications

---

[7]  Dr. Anne's note does not indicate how or whether plaintiff's mother explained the report from Head Start.

[8]  There is no indication in the record that Dr. Anne saw plaintiff again before this third admission, and the record does include any additional notes regarding the circumstances of plaintiff's admission or the course of her inpatient treatment during this third hospitalization.  The record includes only a short note on a "Patient Data Report" that plaintiff was "[r]eadmitted to 5-E on 6-18-04; per [legal guardian] meds not controlling child's behavior" (R. 347), and later references by Dr. Anne and plaintiff's pediatrician in early July to plaintiff's discharge from this hospitalization around the first of July 2004 (R. 444, 573).  Plaintiff's pediatrician's note indicates that plaintiff had been started on Ritalin, in addition to the Clonidine previously prescribed, and that she was "doing a whole lot better" according to her mom, except that she had been having difficulty urinating for a couple of days.  (R. 444).

with "no side effects."  In her mental status evaluation, Dr. Anne noted that plaintiff was

cooperative, was building things [with] blocks, was focusing well, and was not hyperactive.

Plaintiff's mother asked to continue plaintiff on the same medications as she was given on

discharge from the hospital.  Dr. Anne continued plaintiff on Ritalin and Clonidine.  (R. 573-

74).  There are no treatment notes indicating that Dr. Anne saw plaintiff thereafter until

March 17, 2005.  (See Exhibit 15F).[9]

On August 27, 2004, plaintiff's mother took her to the Wiregrass Medical Center

emergency room.  She stated that plaintiff had been very hyperactive all day and that the day

care had reported that she was "acting strange."  Plaintiff's mother advised the ER nurse that

plaintiff had been started on Trileptal two weeks earlier, and that she was also taking Ritalin

and Clonidine.  The emergency room physician instructed plaintiff's mother to stop giving

plaintiff the Trileptal and to follow up with Dr. Lopez next week. (Doc. # 22, pp. 14-20).

On the morning of Monday, January 3, 2005, plaintiff took plaintiff to Dr. Benak,

complaining of a fever which began two weeks previously.  Dr. Benak saw plaintiff just

before 11:00 a.m., and ordered blood work.[10]  About two hours later, at 12:58 p.m., plaintiff's

---

[9] Plaintiff had a number of telephone conversations in January 2005 with Dr. Anne's nurse, Steven Singleton, about plaintiff's worsening behavior. Singleton spoke with Dr. Barefield, who authorized plaintiff's admission to the hospital, and Singleton met with plaintiff and her mother on January 5, 2005. He also spoke with Dr. Anne about plaintiff's care on January 20 and 27, 2005. (R. 370-80; see also R. 608 (nurse's typed signature block)).  However, there is no treatment note from Dr. Anne during this period.

[10] Plaintiff had seen Dr. Benak or other physicians at the pediatric clinic in office visits on December 17, 20, 21, 27 and 30 with complaints of fever and cold symptoms; she was treated with medication for her cold symptoms and antibiotics.  (R. 418-27).  In the "history" portion of his

mother called Dr. Anne's nurse, Steve Singleton, leaving a message that plaintiff's behavior was worse. When Singleton returned her call, plaintiff's mother said that it was plaintiff's first day back at day care, and that plaintiff was having temper tantrums, and was irritable and aggressive. Plaintiff's mother reported that plaintiff had hit her.[11] The following day, Singleton spoke with Dr. Barefield, who told him to admit plaintiff, "once she was seen by [a nurse practitioner]." (R. 379-80). On January 5, 2005, plaintiff's mother met with Singleton. She reported that plaintiff was having sleep pattern disturbance and increasing irritability, defiance, tantrums and violence toward plaintiff's mother and younger sister, including hitting and biting. She said that plaintiff was angry at her father during a visit over Christmas and had torn up his gifts. She stated that, now, plaintiff was showing aggression toward her, toward plaintiff's sister, and toward her "peers at daycare." She indicated that plaintiff was "isolating from peer group" and did not "seem to be herself." Plaintiff was admitted to the hospital that day. (R. 377-78).

The technician who performed plaintiff's intake screening observed, "Patient presented [with] a calm affect. Denies knowing reason for hospitalization. Compliant [with] intake screening." (R. 322). Plaintiff's admission note records her mother's complaint that she "has been more aggressive toward Mom and 21 mos sibling. Screams and attempt[s] to

---

treatment note for the December 27, 2004 office visit, Dr. Ramsey wrote, "[Plaintiff] has had several inpatient admissions for her behavior, and they are thinking about doing this again." (R. 420). The record does not indicate the identity of "they."

[11] Other portions of the nurse's note are illegible. (R. 379).

discipline sibling.  Pt is easily-frustrated and aggravated.  Mood swing[s] are more severe.

Pt does not sleep well.  Awakens @ 2A and 3A every morning. Also pretends she [is] a

puppy. Does not socialize [with] peer[s] her own age." The admitting physician, Dr.

Francisca Mgbodile, diagnosed ADHD, ODD, and "rule out" mood disorder NOS and

bipolar disorder; she assessed plaintiff's admission GAF score at 20.  (R. 266-67).  Nurse

practitioner Partridge performed a physical examination which was essentially unremarkable,

and she noted that plaintiff was cooperative and had a "pleasant affect."  When plaintiff's

mother escorted plaintiff to the inpatient unit, 5E, from the clinic, admitting nurse Wilson

observed that plaintiff was calm and cooperative, but that her affect was "bland."  At shift

change that evening, the staff found plaintiff under her desk; plaintiff said that she was

scared.  After the staff comforted her, plaintiff was able to come out for "snacks and group."

She was noted to be "a little slow to comply [with] participation during group," but was

compliant with "some prompting" and she exhibited no violent behavior; her behavior was

"age appropriate." (R. 287).  She awoke at 1:15 a.m. "very tearful" and crying out for her

mother. She went back to sleep an hour and a half later, after the staff reassured her.

(R. 289).

The following day, January 6th, plaintiff was "somewhat whiny" in the morning, but

was "very bright and smiling a lot" by afternoon. She said that she "does not want to be a

girl[; she] wants to be a dog." She crawled around, acting like a dog, and appeared

"uncomfortable when made to sit up."  She said that "a magician can turn her into a doggy."

When a therapist met with plaintiff's mother that afternoon, plaintiff's mother stated that plaintiff "goes into a state in which she acts like a dog to include barking, licking and standing on all fours."  The nurse noted that afternoon that plaintiff's mom could not get plaintiff to do anything she asked; plaintiff "just said no."  However, plaintiff exhibited no aggressive behavior and no hyperactivity.  (R. 291-93, 295).

Dr. Mgbodile examined plaintiff that day, indicating "short attention span" and "distractible" with checkmarks on a form recording plaintiff's mental status. She also noted "cooperative play," "average IQ," "appropriate" relatedness, affect and mood, "unremarkable" motor behavior and speech, and a "healthy" general appearance.  (R. 275-76).  In handwritten notes, Dr. Mgbodile noted the complaints of plaintiff's mother regarding plaintiff's increasingly aggressive behavior and unstable mood, and her description of plaintiff as an "easy child" until age 2 1/2 years, when her parents started having problems concerning visitation and custody.  She wrote that plaintiff's physical examination and review of systems in the clinic were "within normal limits" and she observed good eye contact, normal speech, cooperative behavior, no fidgeting, and happy mood.  Other than "poor" judgment and "constricted" affect,[12] Dr. Mgbodile noted no abnormalities. She diagnosed ADHD and mood disorder NOS, with "rule out diagnoses of ODD and bipolar disorder.  (R. 281-83).

Plaintiff was evaluated that same day by an occupational therapist.  The therapist

---

[12] In the form completed that same day, Dr. Mgbodile noted "appropriate" affect and mood. (R. 276).

observed that plaintiff's gross motor coordination skills were age appropriate: plaintiff was able to fully ambulate between rooms on the unit.  She was noted to "run/jump/climb on and over furniture well" and was able to bounce, toss and catch a large ball with fair success.  If she missed the ball, she ran after it.  She was "[v]ery playful – enjoyed rolling/bouncing/catching ball – laughing[.]"  The therapist assessed plaintiff's motor coordination, visual-motor and visual perception skills using the Peabody scale – plaintiff scored "above age appropriate skills" for grasping and visual motor integration, at 71 months and 57 months, respectively.[13]  Her cognitive/memory skills were a "concern" – plaintiff had difficulty identifying simple shapes, mixing up the names and shapes.  However, she was able to identify all body parts, farm animals and colors well.  She was noted to be "unable to count past 4/May be [secondary] to lack of exposure – willingness or [illegible]."  The occupational therapist noted that plaintiff was very quiet and shy initially, needing encouragement to talk to others, but that –after she became more comfortable – she was more talkative and increased her social interaction with others, even during free play time.  She "act[ed] like a dog at times" – sitting on the floor, panting and whining, crawling on the floor and pretending to lick objects – but she was "redirectable – able to return focus to task well."  She acted like a dog again later, but the therapist stated that this was "playful – somewhat age appropriate – just needs to be limited/redirected to certain times of day."  The therapist noted that it "proved difficult at times to recall/identify situations that make her mad," but that she

---

[13]  Plaintiff was then approaching 53 months of age.

admitted to hitting, kicking and fighting when not getting her way or having to do something she does not want to do. The therapist observed that plaintiff's "[a]ttention span is good [with] structured activity – noted to sit or kneel in chair – not as fidgety as last admits (2004). Did well with listening/following directions overall. [Positive] impulse control noted – yet may be less impulse control noted [with] other task[s] – esp[ecially] those that may involve danger – *i.e.*, fires – wanting to touch." The therapist reported that, overall, plaintiff's motivation and participation levels were good, her attention span was increased, and she was happy and playful after "warming up" to others. She noted that plaintiff "does have poor insight/recall to bks [secondary] to age" but "age appropriateness noted." She stated, "Very interactive [with] peers noted at playtime." (R. 280).

That evening, after quiet time, the nurse told plaintiff that "a puppy could not come out of her [room], but she wanted [H. (plaintiff's first name)] only to come out." She wrote, "And so be it. [Plaintiff] came out and ate snack, no more puppy tonight." That night, plaintiff slept throughout the night, for nine hours, with no problems. (R. 291-93, 295).

The following morning, January 7th, the nurse wrote that plaintiff was "[v]ery bright this AM, smiling + happy. Sitting like little girl in chair." Dr. Mgbodile evaluated plaintiff noting that she had "good eye contact," her speech was normal, her mood happy, her affect bright, and her thought process and content "goal directed." Her only negative observations were that plaintiff's insight and judgment were "poor," and that she exhibited "[Positive] grandiosity, thinks she can be a 'big doggy[.]'" She diagnosed ADHD by history, mood

disorder NOS and "rule out" bipolar disorder, and prescribed Depakote.  In plaintiff's group session that day, the occupational therapist noted that plaintiff demonstrated "[g]reat eye hand coordination" in performing a bead task, completing a "small dog design."  (R. 284). That afternoon, plaintiff was noted to have a "[V]ery Bright, Happy affect" and "[g]ood peer interaction," but she occasionally pretended to be a puppy and was "redirected." That evening, nurse Wilson observed that plaintiff was playful with her mother, but was slow to follow directions while her mother was on the unit.  The nurse's shift change note indicated that plaintiff was "pleasant and cooperative.  She was slow to comply and needed firm limit-setting."  She was "tearful after snack," and had to be persuaded to stay focused and not become homesick.  She went to sleep at 9 p.m.; she awoke briefly during the night, but was able to return to sleep without a problem, and slept for almost nine hours.  (R. 284, 295-99).

Dr. Mgbodile evaluated plaintiff again the next morning, January 8th, noting fair eye contact, normal speech, happy mood, a "brighter" affect, and that plaintiff was "calm and cooperative."  Plaintiff told her, "I don't want to be a doggy, my mom will get me a puppy." Dr. Mgbodile diagnosed mood disorder NOS, "rule out" bipolar disorder, and ADHD "by [history]." Plaintiff participated in group counseling later that morning; the counselor noted that she was "interactive and appropriate" and noted "no aggression or self-harm."   In the afternoon, the nurse noted a "flat affect" and that plaintiff "completed ADL's this shift with assistance."  However, she noted that plaintiff participated in all unit activities, was "calm and compliant," "displayed appropriate peer behavior" and responded well to "redirection."

The nurse observed that plaintiff became bright in the afternoon when her mother visited. She ate well and slept for nine hours.  (R. 299-303).

The next day, on her fourth full day in the hospital, the counselor again noted plaintiff to be "appropriate and interactive" in group therapy, with "no aggression or self-harm noted." Dr. Mgbodile spoke with the nurse, who reported that plaintiff had exhibited no behavior problems and a bright affect, and that plaintiff had a good visit the previous day with her mother, exhibiting "no tantrums as before." The nurse reported no hyperactivity, fidgeting, or depressed mood, and "[n]o mention of wanting to be a doggy, however she now wants to own a puppy."  Dr. Mgbodile noted no abnormalities in plaintiff's mental status examination other than a "constricted" affect and "poor" insight and judgment, and observed, "[No] delusion of being a doggy."  She discontinued plaintiff's morning dose of Ritalin, continued her on Clonidine and Depakote, and diagnosed mood disorder NOS and "rule out" bipolar disorder.  Plaintiff lost two behavior "stars" that afternoon – one for arguing when she was asked to do something and another for being slow to comply with the staff's request.[14]  The nurse's note indicates that she does not "take responsibility for behavior."  She was asleep by 9:00 p.m. and had an uneventful night, sleeping for nine hours.  (R. 303-07).

The following day, on January 10th, Dr. Mgbodile observed no abnormalities during plaintiff's mental status examination and noted that she "seems to be doing well on

---

[14]  Of the 114 behavior "stars" available to plaintiff (one for each 30-minute period of the five complete days she spent in the hospital, other than sleeping time and time she spent on leave of absence with her mother), plaintiff lost only six.  (R. 349-53).  One of these was for crying due to homesickness after her mother's visit to the unit.  (R. 350).

depakote." She diagnosed mood disorder NOS, "rule out" bipolar disorder, and "[history] of ADHD." She discontinued the Ritalin, continued the Depakote and granted plaintiff 8-hour passes for that day and the next.[15] In her third occupational therapy session, plaintiff was again observed to have good eye-hand coordination, to be "really focused/taking time [with] task[,]" to be very compliant, and in a happy mood. The unit nurse's note indicates that plaintiff "attended group but was qued [sic] for playing and not paying attention." She completed her school assignments and "was compliant with the teacher." She did not demonstrate any violent behavior and, while she was slow to comply at times, she was "easily redirectable." Plaintiff's counselor observed that plaintiff had "not exhibited any noteworthy impulsivity, hyperactivity or aggression." Plaintiff left the hospital with her mother and went to the zoo, returning to the unit at 6:45 p.m. She "displayed none of her targeted behavior." After her return, she "attended unit activities but was unable to focus on activities," and she had to be "redirected for crawling on the floor and 'barking' like a dog." She was asleep at 11:00 p.m. and slept for nine hours. (R. 285, 307-11).

The next day, January 11th, plaintiff's therapist observed that she had been "age-appropriate and compliant," and that the plan was to discharge her "if all goes well" on her leave of absence with her mother. Dr. Mgbodile noted plaintiff's "difficulty following instructions" but that she was "otherwise normal" and had slept for nine hours the previous night. In plaintiff's mental status examination, Dr. Mgbodile noted no abnormalities other

---

[15] In her separate written order entered on that day, Dr. Mgbodile authorized passes of "6 hrs each day" instead of eight hours. (R. 317).

than "poor" insight and judgment; plaintiff was diagnosed with "Bipolar D/O NOS." At plaintiff's fourth and final session with the occupational therapist, plaintiff reported feeling happy, stating that she liked to color and "make doggies," referring to the bead activity.  She demonstrated a good attention span and eye-hand coordination, and was able to identify simple feelings (happy, sad, mad, scared, silly) by visual cues.  Early that afternoon, plaintiff was observed on the unit "playing in age appropriate manner [with] peers and toys" and she was "able to following unit rules."   Upon return to the unit after plaintiff's leave of absence, her mother reported that it "went well."   Plaintiff was discharged to home, in her mother's care, with prescriptions (Depakote, 250 mg, to be taken twice a day, and Clonidine, 0.1 mg, to be taken at bedtime) and with appointments to follow up with Stephen Bell for therapy in two weeks and with Dr. Anne in five weeks.  (R. 264-65, 285, 311-13, 344).  In plaintiff's discharge summary, Dr. Mgbodile noted that plaintiff initially presented as "calm and cooperative," that "[b]y the end of hospitalization she displayed consistent improvement in mood, affect, and behavior," her "aggression had resolved," her "[s]leep was stable," and she had exhibited no adverse side effects to medication.  Dr. Mgbodile's discharge diagnosis was "[b]ipolar disorder, not otherwise specified."  (R. 264).[16]

On January 17, 2005, plaintiff's mother took her to see Dr. Benak, reporting

---

[16]   In the discharge summary, Dr. Mgbodile notes – incorrectly – that the occupational therapist had assessed "slightly delayed" fine motor skills, visual motor skills, and visual perceptual skills.  (R. 264; see R. 279 (summary of OT's assessment, indicating under the heading "Patient's Strengths," "age appropriate" gross motor skills, fine motor skills, visual motor skills and visual perceptual skills), see also R. 280 (observing that plaintiff scored "above age appropriate" skills for grasping and visual motor integration)).

23

symptoms of vaginal pain, frequent urination and headache which had begun "approximately one week ago." Dr. Benak noted that plaintiff appeared to have normal activity and energy level and was in no apparent distress; he noted no abnormalities upon physical examination. He ordered a complete urinalysis. (R. 413-14). On January 20, 2005, plaintiff called Dr. Anne's nurse, Steve Singleton. She told him that plaintiff was "wetting herself up to six times a day" and her "behavior was not any better." She said that, while plaintiff's mood was "maybe" somewhat better and she had exhibited no "dog-like activity," she was still "hyper." Plaintiff's mother told Singleton that plaintiff's pediatrician had ruled out a urinary tract infection and other medical reasons as possible causes for plaintiff's problems with urinating, and that the pediatrician thought that Depakote was causing the problem. Singleton contacted Dr. Anne, who was "not sure [that] Depakote [was] causing [the] problem." Dr. Anne wanted to know what lab tests the pediatrician had conducted. Singleton spoke with Dr. Benak's nurse, who said that Dr. Benak had not ordered any blood work done other than "sed rate," and that he had done a urinalysis. On Dr. Anne's verbal order, Singleton faxed to Dr. Benak's office an order for blood testing for Depakote level, CBC with differential and platelets, and a liver function test. (R. 372-73).

On January 26, 2005, Singleton called plaintiff's mother; she reported that plaintiff's behavior was "better" and that her urinary frequency had decreased. On January 27, 2005, plaintiff's mother took her to Children's Hospital for a sleep study. Singleton noted that plaintiff "appeared calm [and] behaved," and was "[f]ollowing directions 1st cue – did not

appear hyperactive."  Dr. Anne wanted the test for Depakote level repeated after the sleep study, so Singleton gave plaintiff written orders for blood work and directed her to the lab. Plaintiff's Depakote level was reported to be 4.3, below the normal therapeutic range of 50-100 mcg/ml.  Dr. Anne told Singleton to have plaintiff's mother "continue to hold Depakote" until her office visit on February 19th.  Singleton called plaintiff's mother and left her a message asking her to call him back.  (R. 370, 397-98).

At the overnight sleep study on January 27th, plaintiff was reported to be on no medications. (R. 391).  Dr. Makris, the sleep specialist, indicated in a letter to Dr. Benak that plaintiff had poor sleep efficiency, sleeping 429 minutes out of 617 recorded minutes.  She fell asleep immediately but was awake between 1:30 and 3:45 a.m. Her sleep was "otherwise unremarkable."  Dr. Makris stated, "Mom gives [plaintiff] clonidine at bedtime which typically puts her to sleep without difficulty. One of the issues is that the clonidine wears off[ ] around 1:00 in the moning.  We did recommend that she give a trial of clonazepam instead of clonidine as this has a longer half life.  She does have an adequate sleep hygiene." (R. 389-96).

On February 25, 2005, plaintiff's mother reported to psychologist Dr. Jordan that plaintiff was "doing fine . . . from May until December" but that her behavior had declined after plaintiff started back to day care in January.  Dr. Jordan recommended that plaintiff's mother cut back plaintiff's day care to two hours, "thinking that most likely [plaintiff] is having some anxiety, as well as possibly some jealousy, as sister is not having to be in

daycare right now."  (R. 410).  In a visit the following day to pediatrician Dr. Brown for complaints of cold symptoms, plaintiff was still noted to be on clonidine.  (R. 408).

On March 11, 2005, plaintiff's mother told Dr. Jordan that plaintiff was "doing a little bit worse in terms of her hyperactivity," but that the reduction in day care hours "seemed to have decreased her anxiety[.]"  Dr. Jordan noted that plaintiff then had "almost all medications out of her system and is looking much more hyperkinetic" and that she was "having greater difficulty with some of the tantrum components."  Dr. Jordan recommended increasing plaintiff's day care hours in increments of "1 hour every 2 weeks with [plaintiff] knowing what is taking place."  (R. 407).  Plaintiff returned to Dr. Anne the following week, on March 17, 2005, reporting problems for the "past few weeks."  She stated that plaintiff had been "off all medication for past [one month]."  She reported that plaintiff did "fairly well" after her discharge from the hospital and that, after she stopped the Depakote and clonidine, she "did well for [a] few weeks."  Later in the visit, she reported that plaintiff had been "more irritable [and] moody" for the past one month.  Plaintiff's mother reported that plaintiff "is fine as long as she gets what she wants," but that she wants to be the center of attention and that plaintiff "starts hitting her" if she does not give plaintiff attention.  She related that plaintiff has "mood swings," and that she has them "when she doesn't get attention and also if she does get attention."  Dr. Anne's mental status evaluation notes indicate no problems, and that plaintiff "played [with] toys" and "was great during session."  Dr. Anne prescribed Risperdal.  (R. 570).  In his note regarding plaintiff's therapy session

two weeks later, on March 30, 2005, Dr. Jordan indicated that plaintiff's psychiatrist in Birmingham had started plaintiff on Risperdal, and "[s]he has had a pretty nice response to this." (R. 405). The following day, pediatrician Dr. Ramsey noted that "[s]he was seen in Birmingham by Dr. Sirlata [sic]. She was began [sic] on Risperdal. She is doing much better. Daycare is commenting on how good she is doing now." Plaintiff's mother reported "no problems with the medication" but Dr. Ramsey indicated that he believed that plaintiff's reported increase in urinary frequency was a side effect of plaintiff's medication. He recorded, under her diagnosis of bipolar affective disorder, that her status was "[i]mproved." (R. 403-04).

Plaintiff returned to Dr. Anne for follow-up on April 14, 2005. Her mother reported that she was "80% better [with the] medication," that her sleep and appetite were better, she was having "more good days than bad days" and had been "less modd [and] less irritable." She stated that plaintiff was "[d]oing well in day care [with] no behavioral problems." She said that plaintiff's teachers stated that she is "much better," can "focus on work" and "can remember things better." Dr. Anne noted no abnormalities in plaintiff's mental status evaluation. She diagnosed "mood D/O NOS." Plaintiff's mother reported that plaintiff was having no side effects about which she was concerned at the present time and stated that she "wants [plaintiff] to continue same medications in same dose." Dr. Anne again prescribed Risperdal and advised plaintiff's mother to return in two months. (R. 569).

Two months later, on June 13, 2005, plaintiff's mother took her to the pediatrician,

complaining that "Pt has been falling down, being off balance[,] started about 1 month ago. Thought it may be her meds. Started Benadryl to counter[]act it per B'Ham doctors. But she was no better. Pt also [complains of] headaches for 3-4 months. Going to B'Ham Thursday, mom wants her checked out to make sure she is ok before they change her meds. She is going to see psychiatry there." Dr. Ramsey observed that plaintiff's activity appeared to be "normal," and he noted no abnormalities in plaintiff's physical examination and "no problems with [the] neuro exam today." He stated, "I would like to see if they change her medication. If so, then observe. If not, then we will get MRI of brain to include posterior fossa." (R. 609-10).

At her appointment with Dr. Anne on June 16, 2005, plaintiff's mother said that plaintiff was doing "'great' till 3 weeks ago," but that over the past three weeks she had "started having problems like hitting teacher [and] punching other kids." She said that plaintiff had cried for an hour when she could not get her shoes on properly, that she would not listen to her, and that she "wants everything her way." Plaintiff's mother told Dr. Anne that plaintiff "[h]as been clumsy, falling [and] tripping while walking[.]" and that she had been having problems with her gait "over [the] past 2 months . . . like falling [and] tripping over about 10x a day and everyday." Dr. Anne noted that plaintiff was "seen by PMD for the gait problems and is thinking to get MRI. [Mom] said she gave [plaintiff] some Benadryl to see if her gait problem will go away and it didn't." In her mental status examination, Dr. Anne observed that plaintiff was casually dressed and cooperative, her affect was euthymic,

28

her mood fine, her thought process logical, her cognitive function grossly within normal limits and her insight and judgment fair.  She wrote that plaintiff "played [with] toys" and "[w]as quiet," and that she talked about her new day care and teacher. Dr. Anne recommended inpatient neurological evaluation for plaintiff's problems with gait but plaintiff's mother was "not keen on it," stating that she did not want to put plaintiff in the hospital.  Dr. Anne proposed stopping the Risperdal to see how plaintiff's gait progressed, but plaintiff's mother said, "I don't think I or the daycare can deal [with] her behavior [without] Risperdal and I don't want her behavior to get worse."  Dr. Anne recommended that plaintiff's mother try decreasing her Risperdal to 1/2 of a 25 mg tablet and to "see how her [symptoms]/gait problem progresses [illegible]."  Dr. Anne wrote that plaintiff's mother wanted to "go back to PMD to get [outpatient] neurological evaluation" and asked for a letter to her doctor explaining the treatment plan. Dr. Anne told plaintiff's mother to call Children's Behavioral Health and take plaintiff to the emergency room or her primary care doctor if her symptoms got worse.  (R. 567-68).  Singleton signed and faxed a letter to Dr. Benak that day, stating:

> Dr. Anne saw [plaintiff] in the clinic today and reduced the Risperdal to 0.25 mg 1/2 tablet at [bedtime] to see if this helps with the gait/balance problems. Dr. Anne agrees with your recommendation, as reported by Ms. Branning, to do a complete Neurological work-up on [plaintiff].  Dr. Anne will return to the clinic on 6/23/05, if you have any questions please call 205-939-9193.

(R. 608).  Dr. Ramsey ordered a brain MRI, which was performed on June 23, 2005; it was unremarkable.  (R. 607).

29

On August 17, 2005, plaintiff returned to her pediatrician's office for her five year "well child" check-up. She was still noted to be on Risperdal. The examining nurse practitioner indicated, under the heading "Behavioral/Developmental" that plaintiff "[s]kips, walks on tiptoes, jumps; names colors and coins; dresses and undresses without supervision; knows nursery rhymes and songs; recognizes most of the alphabet; draws person with head, arms and legs." She stated that plaintiff "'appears' to have normal activity, no change in appetite, sleeping normally." She noted no abnormalities in plaintiff's physical examination and did not reference any complaints or concerns from plaintiff's mother. (R. 597-99). A month later, on September 14, 2005, plaintiff returned and saw Dr. Benak; her mother was "concerned about weight gain" but knew that it was a "side effect of the medicine." (R. 595). Plaintiff had an appointment with Dr. Anne two weeks later, on September 28, 2005. Plaintiff's mother said that plaintiff was having problems at school, and "[p]er teacher [plaintiff] is in her own world, been disruptive in class, been disrespectful towards teacher, having difficulty to stay on task." Plaintiff's mother gave Dr. Anne "a note from teacher stating how pt was behaving in school."[17] She reported that plaintiff has good and bad days at home and has been "moody [and] feeling frustrated." Plaintiff told Dr. Anne that she was "learning to read at school." Plaintiff's mother said that she was giving plaintiff 25 mg of Risperdal three times a day. In plaintiff's mental status examination, Dr. Anne noted no abnormalities. She diagnosed mood disorder NOS and added a diagnosis of ADHD NOS.

---

[17]  The referenced note from plaintiff's kindergarten teacher is not included in Dr. Anne's records, and was not provided to the ALJ.

She prescribed Risperdal, but told plaintiff's mother to decrease the number from three times a day to once.  She also prescribed Ritalin, "[b]ased on reports from teacher that [plaintiff] is disruptive in class and not paying attention."  (R. 564-66).

At her appointment on October 28, 2005 with Dr. Anne, plaintiff's mother reported that plaintiff was "not doing good."  She said that plaintiff had been "refusing to do things, not able to complete work, fidgety, constantly busy doing something."  Dr. Anne wrote, "Per teacher [plaintiff] is disrupting the class, not focusing, beating on her [illegible] has difficulty to complete tasks."  Plaintiff's mother reported that she was compliant with medication, with no side effects.  Dr. Anne noted "No [history] of aggressive behavior but has been getting [illegible] [with] sister."  In her mental status examination, Dr. Anne noted that plaintiff was cooperative, her affect euthymic and her mood fine, but that she was disruptive, loud and difficult to redirect.  She was "touching everything in the room" and interrupted her mother several times while her mother was talking.   Dr. Anne diagnosed mood disorder NOS and ADHD NOS and adjusted plaintiff's medications.  She prescribed an increased dosage of Trileptal and discussed trying plaintiff on another medication due to her hyperactivity and difficulty focusing in school.  She spoke with plaintiff's mother about its side effects, including mood changes, and told plaintiff's mother to call if plaintiff's symptoms got worse. (R. 588).[18]

---

[18] Dr. Anne's note includes the name of the medication, but her handwriting is illegible.  Dr. Anne did note that she "Reviewed report from teacher.  Copy in [illegible]."  However, the teacher's report Dr. Anne reviewed at this office visit also was not provided to the ALJ.  (R. 588).

Two weeks later, on November 12, 2005, plaintiff returned to her pediatrician's office with complaints of upper respiratory symptoms. She was treated by CRNP Wakefield who noted, under "History," that plaintiff's behavioral problems were "better." (R. 591). Two weeks after that, a nurse practitioner from Dr. Anne's office, Brittany Rigsby, sent a letter to the attention of plaintiff's mother, and directed "To whom it may concern." The letter stated:

> I am writing this letter to give information about treatment for [plaintiff]. She is a patient of Dr. Srilata Anne, M.D. She is currently being treated for Mood Disorder, Not otherwise specified and Attention Deficit Hyperactivity Disorder, Nos. We would recommend that [plaintiff] have her own bedroom and not have to share one with her 2 yo sister. [Plaintiff] can be aggressive, irritable and has significant mood swings. It would be safest for her not to share a room with a child as young as her sister. Please call if you have any questions.
>
> Her current medications are:
> • Trileptal 300 mg BID
> • Clonidine 0.05 mg q hs

(R. 587).

At the administrative hearing on January 11, 2006, plaintiff's mother testified as follows:

Plaintiff is in kindergarten. She lives with her mother and her two-year-old sister, Riley. She is doing "pretty good" academically but, behaviorally and socially, she is having a rough time. At home, she has good days and bad days. She is on medication but it does not do very much. She still has sudden outbursts or panic attacks over nothing. She will yell at her sister or throw fits over nothing. When she has a panic attack, she will start screaming

and yelling.  Sometimes, she kicks her mother – for some reason, she tends to "take it out" on her mother.  Other times, she wants to be in her room alone.  For this reason, her family is having to move to a bigger home to allow her to have her own room.  Plaintiff's moods were "getting out of control" and plaintiff's mother spoke with the psychiatrist who told her that a child like plaintiff needs her own space. The psychiatrist recommended that plaintiff have her own room.  She wrote a letter so that plaintiff could get approval from housing to get another apartment. There is a lot of tension between plaintiff and her sister.  They fight a lot, and plaintiff is usually the one who instigates the problem.  Plaintiff does not like anybody "messing with her stuff."

Her medication has "taken the edge mostly off" of her outbursts and, right now, it is doing "fairly well," better than nothing at all.  Because of her medication, she is losing weight, has trouble sleeping, and has trouble with her blood pressure.  Plaintiff's mother has to monitor plaintiff's blood pressure and has been doing so ever since plaintiff has been taking Clonidine, "off and on for about two years."  They have been seeing Dr. Jordan in Dothan "as [they] need him, like any time that [they've] had . . . drama or anything that goes on[.]" They have not had to go to Dr. Jordan lately because plaintiff is "doing okay."  There is not a lot Dr. Jordan can do as far as counseling because he doesn't know what to do because of plaintiff's age.  They go to plaintiff's psychiatrist in Birmingham in order to keep plaintiff stable on her medication.  Plaintiff does not have any physical limitations.  She does have seasonal allergies which affect her in the winter.  Plaintiff is "hyper" and cannot get

33

focused and it affects every aspect of her life.  She is easily distracted and has problems

sitting still.  She is forgetful and talks a lot.  She has problems waiting her turn and often

interrupts.

        Plaintiff has mood swings, and her teacher also "seems to notice them."  Her OCD has

"not gotten . . . severe. . . . It's not like a severe case."  She has to have her belongings, like

her baby dolls and blankets, a certain way.  Sometimes she gets frustrated and cries for no

reason.  Plaintiff withdraws from her mother, but she does not want her sister to be away

from her for long.  She loves school and does not like to be out of school for very long.  She

did not do well over the holidays; she wanted to be at school. She likes a structured

environment.

        She is okay when her father visits, but she worries after he leaves about whether he

will be there the next day and, when he is not, she "freaks out."  She does not understand why

he is not there.  After her father leaves, her problems are worse for about two weeks "and

then it starts to mellow out and be back to . . . the way it was."  (R. 624-33).

        The record includes no treatment notes from Dr. Anne between October 28, 2005 and

July 31, 2006, nine months later.[19] (Exhibit AC-1).  At the July 2006 visit, plaintiff's mother

---

[19]  The dates written by Dr. Anne on the treatment notes plaintiff's counsel sent to the
Appeals Council look like "7/31/08" and "10/11/08," rather than "06."  (See R. 611, 613).  However,
the records bear a facsimile transmission legend at the top of each page indicating the date on which
they were sent by plaintiff's counsel to the Appeals Council – that is, on May 31, 2007.  Text within
the treatment notes also indicate that the correct date is 2006; the July 31 note states that plaintiff
"will be starting 1st grade," and Singleton's annotation on the record following Dr. Anne's October
11 treatment note is dated "10/13/06."  (R. 612, 613).

and Dr. Anne discussed adjustments in plaintiff's medication.  Plaintiff's mother reported that plaintiff had been having problems with focus and had also been getting "hyper" after lunchtime.  She said that plaintiff's sleep was "still not good," but that plaintiff went to sleep at 10 p.m. and "wakes up around 7 AM."  She reported no history of attempts by plaintiff to hurt herself or others, no aggressive behavior, no history of vocal tics, and that plaintiff was not "clapping hands like before."  Dr. Anne noted no abnormalities in plaintiff's mental status evaluation.  (R. 613). Plaintiff next returned to Dr. Anne on October 11, 2006, reporting that she "knows how to spell now."  Plaintiff's mother said that plaintiff's teacher reported that "[Plaintiff] makes big deal over little things like if she breaks something or when a pencil breaks or paper rips" and that, at home, plaintiff was having problems with focus after 2 p.m.   She said that, even with the Clonidine, it took plaintiff two hours to fall asleep.  She reported no history of mood symptoms or aggressive behavior or self-injurious behavior.  Dr. Anne's mental status evaluation again noted no abnormalities, and she and plaintiff's mother discussed adjustments to plaintiff's medications. Plaintiff's mother declined Dr. Anne's suggestion that they increase plaintiff's Dexedrine at noon, stating that the plaintiff "is not having problems at school yet" and that her problems were at home during homework time.  Dr. Anne noted plaintiff's two-pound weight loss since her previous visit; plaintiff's mother reported that plaintiff had "been eating good" and that she was also giving plaintiff Pediasure.  Dr. Anne advised plaintiff's mother to check plaintiff's weight weekly and to call if plaintiff continued to lose weight.  (R. 611-12).

**Dr. Anne's Functional Assessment Form**

As noted previously, Dr. Anne signed a form on December 21, 2005 indicating that plaintiff was limited in all six domains, markedly so in three of them: interacting and relating with others, ability to care for herself, and health and physical well-being. (Exhibit 17F). Plaintiff argues that the ALJ erred as a matter of law because he failed to give Dr. Anne's opinion the deference it is due as the opinion of plaintiff's treating specialist.[20]

"If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir.

---

[20] The Commissioner's contention that Dr. Srilata Anne is not entitled to "treating physician" status because "the record does not demonstrate a longitudinal, treatment relationship between Plaintiff and Dr. Srilata" is without merit.  (Commissioner's brief, p. 5).

36

1986)).  "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error.  Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).  The Eleventh Circuit has found good cause for discounting a treating physician's report when the report "'is not accompanied by objective medical evidence or is wholly conclusory.'"  Crawford, supra (quoting Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir.1991)).  Additionally, there is good cause where the treating physicians' opinions are "inconsistent with their own medical records,"  Roth, supra (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) or "when the opinion appears to be based primarily on the claimant's subjective complaints[.]"  Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007)(citing Crawford, supra).  "The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.  Carson v. Commissioner of Social Sec., 373 Fed. Appx. 986, 988 (11th Cir. Apr. 20, 2010)(citing Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985)).

In considering the questionnaire completed by Dr. Anne, the ALJ stated that "[t]he objective medical evidence does not support mental limitations of the severity shown by [Dr. Anne in Exhibit 17F].  (R. 31).  He further observed that "Dr. Anne provided no rationale for these limitations" (i.e., that the opinion is conclusory) and, further, that the limitations set forth in the questionnaire "are very inconsistent with limitations shown by the claimant's

kindergarten teacher on December 16, 2005, five days earlier." (Id.). The ALJ noted, additionally, that the "limitations shown by Dr. Anne are inconsistent with the testimony of the claimant's mother that the claimant had not gone to her psychologist recently because she had been doing okay." (Id.). Finally, the ALJ found the limitations to be inconsistent with the testimony of claimant's mother that claimant's medications were not adjusted during her most recent visit with Dr. Anne. (Id.).

Plaintiff argues that the ALJ's "analysis points out only a couple of instances throughout the pendency of this claim" and "does not take into account the ups and downs that HTB has experienced throughout her life and the pendency of this claim." (Plaintiff's brief, p. 4). Plaintiff's argument has merit only with regard to the final inconsistency identified by the ALJ – i.e., that claimant's medications were not adjusted at her most recent visit. Plaintiff has received a number of different prescription medications, and a number of medication adjustments, over the course of her mental health treatment.

However, the ALJ identified other reasons for declining to credit Dr. Anne's opinion. He points to the fact that plaintiff had not sought counseling from her psychologist recently because, according to her mother, she was doing "okay." Plaintiff's mother so testified at the hearing, immediately following her testimony that she and the plaintiff do go to Dr. Jordan "as we need him, like any time that we've had, you know, drama or anything that goes on, we go to him." (R. 626). According to the record before the court, plaintiff and her mother have gone to Dr. Jordan three times, all three of those visits within a period of just

38

over a month, during the relevant time period.  Plaintiff's mother filed the present application

on July 6, 2004.  At that point, plaintiff's first three hospitalizations in Birmingham were

behind her, as was the incident in which plaintiff suffered the back-to-back reactions to Paxil

and then to Ativan.  Plaintiff's mother took her to see Dr. Jordan on February 25, 2005,

almost eight months after she filed her application for benefits; in his note for that visit, Dr.

Jordan wrote that he had not seen plaintiff for about a year and, also, that plaintiff's mother

told him that "[plaintiff] *was doing fine . . . from May until December*."  (R. 410)(emphasis

added).  The evidence before the Commissioner included records of only two other visits to

Dr. Jordan  – on March 11, 2005 and March 30, 2005.  (R. 405, 407).  On the last of these

visits, as the ALJ observed, Dr. Jordan "noted that the claimant had experienced a 'pretty

nice response' to Risperdal" which had recently been prescribed. (R. 22, 405). Thus,

plaintiff's mother took her to Dr. Jordan for counseling for just over one of the twenty-five

months between the filing of her application and the ALJ's decision.  The fact that plaintiff's

mother was able to testify – on January 11, 2006 – that they had not "had to go [to Dr.

Jordan] lately because she's doing okay" is, as the ALJ suggests, inconsistent with the

opinion rendered by Dr. Anne *only three weeks earlier* that plaintiff suffers from disabling

limitations.

The ALJ also noted that Dr. Anne's opinion that plaintiff suffers from marked

limitations, causing serious interference with her ability to function, in the domains of

interacting and relating with others, caring for herself and health and physical well-being are

"very inconsistent" with the observations made by plaintiff's kindergarten teacher five days earlier. Dr. Anne signed the questionnaire on December 21, 2005. Plaintiff's kindergarten teacher, Amanda Cofield, completed a questionnaire on December 16, 2005 regarding the plaintiff's activities. Contrary to plaintiff's argument, however, Ms. Cofield was not describing plaintiff's behavior on a particular "instance." Rather, she indicated that she had known plaintiff for five months, and that she sees her for seven hours a day, five days a week, when she teaches plaintiff and nineteen other students. (R. 141). The questionnaire completed by Ms. Cofield lists a number of specific functions within each of the six domains (a total of 53 for the six domains). It asks the teacher to rate her student, in any of the domains as to which the teacher has observed a problem, on each of the listed functions compared to the functioning of same-aged children without impairments and, as to some of the identified behaviors, asks how frequently they have been observed. The questionnaire completed by Dr. Anne, in contrast, gives a broad single-sentence definition of each of the six functional areas and asks for a rating of none, mild, moderate, marked or extreme; it allows room for comment only at the end of the form.

In the five months preceding completion of their respective forms, Dr. Anne saw plaintiff two times – once in an office visit in September and the second time in an office visit in October – both times with her mother. The record does not reflect that Dr. Anne ever observed plaintiff interacting with other children. (R. 564-66, 588). Cofield indicated that she had observed no problems in the domains of acquiring and using information, attending

and completing tasks or moving about and manipulating objects.  (R. 142-44).[21]  Cofield indicated that plaintiff does have a problem functioning in the domain of interacting and relating with others.  She rated thirteen specific functions in this area.  As to the eight of those functions – making and keeping friends; asking permission appropriately; following rules (classroom, games, sports); relating experiences and telling stories; using language appropriate to the situation and listener; introducing and maintaining relevant and appropriate topics of conversation; interpreting meaning of facial expression, body language, hints, sarcasm; and using adequate vocabulary and grammar to express thoughts and ideas in general, everyday conversation – Cofield indicated that plaintiff has "[n]o problem." She observed that plaintiff has "[a] slight problem" with seeking attention appropriately and taking turns in a conversation, and that these problems occur weekly; she indicated that plaintiff also has "[a] slight problem" with respecting and obeying adults in authority and playing cooperatively with other children, and that plaintiff exhibits these problems monthly. Cofield indicated that plaintiff has "[a]n obvious problem" with "[e]xpressing anger appropriately," and that she has this problem on a weekly basis.  However, Cofield responded, "No" to the question, "Has it been necessary to implement behavior modification

---

[21]  Dr. Anne had rated plaintiff's limitations in these domains as "mild," "moderate," and "moderate," respectively.

strategies for the child?" (R. 145). [22, 23]

Cofield also noted that plaintiff has problems in the domain of caring for herself, specifically: an obvious problem in responding appropriately to changes in her own mood (*e.g.*, calming herself), which she exhibits weekly; and slight problems with handling frustration appropriately, being patient when necessary, and identifying and appropriately asserting emotional needs, which she exhibits only monthly.  In the remaining specific functions – taking care of personal hygiene, caring for physical needs (*e.g.*, dressing, eating), cooperating in or being responsible for taking needed medication, using good judgment regarding personal safety and dangerous circumstances, using appropriate coping skills to meet daily demands of school environment, and knowing when to ask for help – Cofield has observed no problems.  (R. 147).[24]

Ms. Cofield did not observe a "serious" problem in any of the 53 specific functions listed on the form.  She indicated that she had observed an "obvious" problem in two specific

---

[22]   The questionnaire gave examples of behavior modification strategies, "(e.g., behavior plan, personal assistant, time-out, quiet room, removal from the classroom, change of school placement, suspension, expulsion)."  (R. 145).

[23]   Dr. Anne rated the "[e]stimated degree of impairment of the claimant's ability to interact and relate with others" as "marked."  Her questionnaire explained, "The issue in this domain is how well the child initiates and sustains emotional connections with others, develops and uses the language of his or her community, cooperates with others, complies with the rules, responds to criticism, and respects and takes care of the possessions of others."  (R. 589).

[24]   Dr. Anne was asked to rate plaintiff's estimated degree of impairment in the ability to care for herself, which was explained as "how well the child maintains a healthy emotional and physical state, including getting physical and emotional needs met in appropriate ways; how well he/she copes with stress and changes in the environment; and whether he/she cares for his/her own health, possessions, and living area."  (R. 589).

functions: (1) "[e]xpressing anger appropriately," on a weekly basis, in the domain of

interacting and relating with others; and (2) "[r]esponding appropriately to changes in own

mood (e.g. calming self)," also on a weekly basis, in the domain of caring for herself. The

form that Dr. Anne was asked to complete – by necessity, since she had few opportunities

to personally observe plaintiff's behavior – asks for her professional *estimate* of plaintiff's

level of impairment in the various domains.  The form provided to Ms. Cofield, in contrast,

asks for her *observations* of the degree to which plaintiff's actual performance of specific

functions within the domains is limited and how often the identified problem has occurred.

The ALJ's observation that the limitations expressed by Dr. Anne are "very inconsistent"

with the limitations indicated by plaintiff's teacher – *i.e.*, that the limitations estimated by Dr.

Anne do not match up with those actually observed by her teacher – is supported by

substantial evidence.[25, 26]

---

[25]  Dr. Anne estimated that plaintiff's "physical and mental impairments and their associated treatments or therapies" had markedly (*i.e.*, seriously) affected plaintiff's physical functioning (other than in the domain of moving about and manipulating objects). (R. 590).  In this domain, the form provided to Ms. Cofield does not ask her to rate specific functions and is arguably less probative than her observations in the other domains.  However, the questionnaire stated, "Describe below any chronic or episodic condition (e.g., asthma, sickle cell anemia, depression, seizures).  Does the condition have any physical effects (e.g., shortness or breath, reduced stamina, psychomotor retardation, incontinence, pain) that interfere with the child's functioning at school?"   Ms. Cofield responded, "I have not seen any symptoms or conditions." Additionally, she circled "No" in response to the question of whether the child frequently misses school due to illness. The fact that any physical effects plaintiff suffers as a result of her impairments had not been noticed by her teacher who, while she is a layperson, was with plaintiff for seven hours each weekday, and the fact that the physical effects of plaintiff's impairments and treatments did not cause plaintiff to miss school frequently weigh against finding a  "marked" limitation in this domain.

[26]  Cofield's observations, as set forth on the questionnaire, also do not match up with the reports plaintiff's mother made to Dr. Anne during her two appointments in this time period of

The ALJ also stated that limitations of the severity expressed by Dr. Anne in the questionnaire are not supported by the objective medical evidence.  (R. 31).  The severity of most of the functional limitations caused by mental impairments cannot, obviously, be demonstrated by an objective test.   However, Dr. Anne's own clinical observations of plaintiff's mental status during office visits, as recorded in her treatment notes, were – during the relevant period under consideration by the ALJ – unremarkable on every occasion but one.  (See R. 564, 567, 569, 570, 573, 588, 613).   Similarly, of the many observations of the Children's Hospital staff recorded in the treatment records for plaintiff's hospitalization in January 2005, few are of note. Aside from pretending to be a puppy, and her conduct on the few instances on which she lost a behavior "star," plaintiff exhibited none of the behavior for which she was hospitalized, from the time of her admission until her discharge.  (See Exhibit 12F).[27]   While Dr. Anne's rating of plaintiff in the domain of "moving about and manipulating objects" would not support a functional equivalence finding – she estimated that plaintiff is "moderately" impaired in this domain – the rating is remarkable for the overwhelming extent to which it is contradicted by the objective evidence of record.  (See, e.g., R. 280 (January 2005 OT evaluation of gross and fine motor skills); R. 567, 570 (Dr. Anne's observation that plaintiff was playing with toys during the office visit); R. 597 (CRNP Wakefield's August 2005 note that plaintiff "[s]kips, walks on tiptoes, jumps . . .

plaintiff's behavioral and social problems at school.  (See R. 564, 588).

[27] The court acknowledges that the hospital provided plaintiff with a structured setting.

44

dresses and undresses without supervision, draws . . ."); R. 627 (mother's hearing testimony that plaintiff does not have any physical limitations); Exhibit 17E (kindergarten teacher's questionnaire observing no limitations in this domain); Exhibit 8F (Dr. Cotter's observations that plaintiff sorted through toys and lined them up, built a construction with blocks and displayed good pencil grip, could copy a line and a circle)).  It is possible that Dr. Anne based her estimate of "moderate" limitation in this domain on the complaints voiced by plaintiff's mother of plaintiff's problems with her gait, and with frequent tripping and falling (initially diagnosed by the pediatrician as ataxia); however, this complaint arose in mid-June 2005 and did not surface again, despite the fact that plaintiff's mother had – contrary to Dr. Anne's suggestion – increased rather than decreased the amount of Risperdal she administered to plaintiff.  (R. 564-68, 607-09).  Accordingly, even if the alleged problem with coordination and balance formed the basis for Dr. Anne's opinion of "moderate" limitation in this domain, it would not support her accompanying opinion regarding the duration of the limitation at that level.[28]

The reasons articulated by the ALJ constitute "good cause" for declining to give the opinion expressed by Dr. Anne in the questionnaire controlling, substantial or considerable weight, and those reasons are supported by substantial evidence.  Accordingly, the ALJ did not commit legal error, as plaintiff contends, in evaluating Dr. Anne's opinion.

---

[28]  Dr. Anne may have had some other basis in mind when she rated plaintiff's level of limitation in this domain.  However, as the ALJ noted (R. 31), she "provided no rationale" for the limitations set forth in the questionnaire.

## Dr. Simpson's Opinion

Plaintiff next asserts that "[t]he Commissioner's decision should be reversed, because the ALJ failed to state with particularity the weight he gave the medical opinion expressed by Dr. Simpson, the reviewing state agency psychologist."  (Plaintiff's brief, p. 3; <u>see also</u> <u>id</u>. at p. 5).[29]   In assessing the evidence, an ALJ is required to "state with particularity the weight he gave the different medical opinions and the reasons therefor."  <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279 (11th Cir. 1987)(citation omitted).   On August 20, 2004, based on his review of the evidence then in the file, Dr. Simpson determined that plaintiff has "marked" limitations in attending and completing tasks, "less than marked" limitations in interacting and relating with others, and "No Limitation" in the remaining four functional domains. (Exhibit 11F). As plaintiff acknowledges in his brief, the ALJ states that:

> The objective medical evidence supports the mental limitations shown by William Simpson, Ph.D., a reviewing state agency psychologist, on August 20, 2004, with the exception that the claimant has less than marked limitations in the domain [of] attending and completing tasks in comparison to marked as shown by Dr. Simpson, and the claimant has less than marked limitations in the domain [of caring] for yourself in comparison to no limitations as shown by Dr. Simpson (Exhibit 11F).

(R. 31).  The court finds that the ALJ stated quite clearly, and "with particularity," the weight he gave to Dr. Simpson's assessment.

Plaintiff's real point of contention – seemingly added as an afterthought at the end of his argument – is that the ALJ did not state his reasons for diverging from Dr. Simpson's

---

[29]  The Commissioner did not respond to this argument.

46

findings adequately. (Plaintiff's brief, p. 6)("[T]he ALJ failed to state with particularity *why* he rejected some of the opinion expressed by Dr. Simpson. He simply stated that the evidence supports the limitations shown by Dr. Simpson except in two domains, *without further explanation*.")(emphasis added). As noted above, the ALJ found the plaintiff to be more limited than indicated by Dr. Simpson in the domain of caring for herself, and less limited than indicated by Dr. Simpson in the domain of attending and completing tasks. At that precise point in his decision, the ALJ stated his reason in broad terms – *i.e.*, that the objective evidence of record supported Dr. Simpson's opinion, except as to his ratings in these two identified domains. However, the ALJ: (1) identified specifically the two of Dr. Simpson's ratings with which he disagreed; and (2) structured his decision so that, under a separate heading for each of the domains and directly following his underlined finding for that particular domain, he identifies precisely the evidence on which he relied in rating plaintiff's level of limitation. (See R. 25 (attending and completing tasks) and R. 28 (caring for yourself)). The ALJ was not required to repeat his rationale to avoid reversal.[30, 31]

Additionally, Dr. Simpson found plaintiff to have "marked" limitations in only one

---

[30]   The court has been confronted previously with the task of reviewing an ALJ's written decision which summarizes *all* of the evidence of the record, then states – without further explanation – that "the objective evidence of record" either supports or does not support a particular conclusion (most often regarding credibility). Such a decision does not provide an adequate basis for reviewing the sufficiency of the ALJ's finding. This is not such a case. One can ascertain the particular evidence on which the ALJ relied in diverging from Dr. Simpson's ratings simply by turning a few pages.

[31]   Plaintiff does not challenge the sufficiency of the ALJ's reasons for the weight he accorded to Dr. Simpson's ratings; she argues that he did not state those reasons adequately.

domain, and he did not find an "extreme" limitation in any domain.  Even if fully credited, Dr. Simpson's opinion would not mandate a finding of disability.  See Shinn, 391 F.3d at 1279 (a child's impairment functionally equals the listings if the child has marked limitations in two domains or extreme limitations in one)(citations omitted).  Even assuming that the ALJ erred in stating either the weight he gave to Dr. Simpson's opinion or his reasons, any such error is harmless.  See Caldwell v. Barnhart, 261 Fed. Appx. 188, 190 (11th Cir. 2008)(ALJ's failure to state the weight he accorded to the functional limitations indicated by a consultative physician was harmless where, even if the ALJ had included those additional limitations in plaintiff's residual functional capacity, plaintiff could still have performed one of the jobs identified by a vocational expert as existing in significant numbers in the national economy – i.e., "the application of Dr. Bell's limitations would not have changed the result").

## CONCLUSION

Upon review of the record as a whole, the court concludes that the ALJ's decision is supported by substantial evidence and proper application of the law.  Accordingly, the decision of the Commissioner is due to be AFFIRMED.  A separate judgment will be entered.

Done, this 20th day of September, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE